HARGIS, ADMINISTRATRIX *v.* HARGIS.

4-9988                                              255 S. W. 2d 663

Opinion delivered February 23, 1953.

Rehearing denied March 30, 1953.

*Spencer & Spencer,* for appellant.

*DuVal L. Purkins,* for appellee.

GRIFFIN SMITH, Chief Justice. W. C. Hargis, Sr., formed a partnership with his two sons—James V., and W. C., Jr.—January 1, 1948. James died July 1, 1950, and the question to be determined is what interest his estate has in profits realized from the automobile business subsequent to creation of the interest-sharing relationship.

In 1928 the elder Hargis and his brother, Bernie, were partners owning Hargis Bros. Sales & Service. Bernie retired from the enterprise early in 1946 and W. C., Senior, conducted the business as sole owner until the contract with his sons was executed. At that time the investment account stood at $201,651.93. Neither son acquired a proprietary interest in the physical property. The father was to be paid "approximately" $8,500 per year at $700 per month; W. C., Junior, had a drawing account of "approximately" $5,500, and James was to receive $5,000. Each was forbidden to withdraw "assets in excess of his salary", or assets in anticipation of profits to be earned, without written consent of all.

Early in 1949 agents of the U. S. department of internal revenues made inquiries to determine whether tax returns had been properly made. At a later date they began checking books and other records. James, who had been afflicted with heart trouble for twenty years—or, as the father testified, since he was six or

seven—was ill when the revenue accountants began their work and was not informed that it was being done.

In consequence of revenue audits it was ascertained that unpaid taxes, penalties, and interest for 1945, 1946, and 1947, amounted to $122,760.50, and that the 1948 deficiency was $7,406.57. These assessments have been paid, but the senior Hargis insists that participating profits earned after the father-and-son partnership was created should be treated as assets available not only for payment of the 1948 debt, but for the 1945-'6-'7 obligation as well. A further insistence is that $11,644.37 paid to an accounting firm for checking with the government men and effectuating a settlement should be taken from accumulated profits of the two sons.

Appellant, who sued to establish her dead husband's interest, contends that preponderating testimony shows that earnings apportionable to James for 1948, 1949, and 1950 amounted to $30,069.56. She concedes that James' estate should pay its part in proportion to the ratio of division, which was a third to each of the partners from 1948 profits, and 26% to W. C., Junior, for 1949 and 1950. Since for these two years the father took 50%, the remaining 24% went to James.

The contract does not provide what the shares shall be, but each of the interested parties concurred in the percentage arrangements shown on the books. We think the lower court correctly treated these credits as amounts mutually agreed upon for each of the years involved. It was further shown that profits were realized from business operations other than the automobile agency and were entered on the books without objection by either of the three. In these circumstances it would not be equitable, after the death of one partner, for the survivors to make a different determination. Each of the three was competent to handle business affairs, and if they chose to mingle outside income with partnership assets and apportion profits in a manner then mutually satisfactory, equity would be ill-served by permitting a substituted method when to do so would have the effect of reducing the dead son's credit balance.

When it became apparent that agents of the bureau of internal revenues were likely to demand that W. C. Hargis, Sr., amend his tax returns, a firm of certified public accountants (Fred Rogers & Co. of Little Rock) was employed by W. C., Senior and Junior, to represent the partnership in reaching settlements. A great deal of this work went back to 1945. The accountants were paid $11,644.37, and it is urged that this is partly chargeable to James. It was also shown that the agreed tax settlement involved a restatement of physical values, including automobile parts and accessories. Under the new reckoning $42,000 was added to the inventory.

The Rogers audit—supported, as we think, by the weight of evidence—shows that profits credited to James' account over the three-year period were $30,069.56, aside from withdrawals. However, a tax deficit of $6,568.28 for 1948 was established. Since each partner is chargeable with the full amount assessable as taxes, and since the 1948 profits were evenly split, the accountants extended a charge of $2,282.94 against James' credit. This was $121.78 more than W. C., Junior, paid, and $158.76 in excess of the father's payment. But no point is made of these slight variations, and we treat the item of $2,282.94 charged to James as correct, thereby reducing the credit balance to $27,786.62. From this there should be deducted interest paid on James' third of the 1948 deficiency, $285.74, leaving $27,500.88.

The seventh section of the partnership contract anticipates the death or legal disability of one or more of the three. An obligation is imposed upon the active partner or partners to continue the business until December 31st following such death or disability. At that time the survivors had a right to purchase the outstanding interest at not more than 10% above the outgoing partner's proprietary interest, "as shown by the balance of his capital account after the books are closed Dec. 31".

The court found that it was "likely probable" that all parties to the litigation were in better financial position than would have been the case had liquidation occurred.

The Chancellor rejected contentions of the surviving partners that income tax deficiencies for 1945 and 1946 should be ratably charged against James' interest. But a different rule was applied to the 1947 obligation. This tax, said the Chancellor, did not mature until January 1, 1948, and the obligation, as such, first attached March 15—the final day for making a return unless additional time should be granted. Because James acted as book-keeper for his father during 1947 when the tax was earned, and due to the further fact that he served in the same capacity for the first two and a half months of 1948, it was the court's belief that he knew of the deficiencies; or, if he did not actually know of them, he was charged with such knowledge.

In his opinion the Chancellor calls attention to the Uniform Partnership Act, Ark. Stat's, § 65-117, and the obligation of a person "admitted into an existing partnership". Such admitted partner is charged with obligations "of the partnership" arising before his admission; but the liability in point of satisfaction extended only to partnership property. This statute, said the Chancellor, subjected the interest of James V. Hargis "to his share" of the 1947 tax. The court was also persuaded that 26 USCA, § 311, "does the same thing".

In ascertaining James' proprietary interest the court charges his book credits with 24% of $53,847.51, or $12,923.40. The opinion, however, does not disclose details showing how the book credit was arrived at. As we have heretofore mentioned, testimony of E. Ray Kemp, one of the accountants employed by W. C. Hargis, Junior and Senior, was that $27,500.88 remained after James' share of the 1948 tax deficiency had been charged to him. But the Chancellor construed the accountant's statement to be that $23,384.12 "represents the capital account of James V. Hargis, . . . *as related to the automobile and garage business*". So it appears certain that outside transactions were eliminated, although they passed through the partnership books and were treated as earnings of the three associates. The trial court's construction must be rejected and the earnings from these

sources will be made to conform to what the partners apparently intended when the profits were realized.

After deducting $12,923.40 from $23,384.12, the remainder of $10,464.72 was adjudged to be the value of James' interest as of Dec. 31, 1950. Interest at 6% for 16 months was ascertained. This, with the capital account, increased the credit to $11,297.57, for which judgment was given.

In reaching this result the Chancellor rejected defendant claims that James' balance should be charged with tax deficiencies due by W. C. Hargis, Sr., for 1945 and 1946. Rejected, also, was a contention that $7,181.16 should be taken from the 1948 credit because, for income tax purposes, the inventory account had been increased. There is testimony by Kemp that "in a way" James received the benefits of this writeup. But there is no showing that particular items of the inventory were undervalued; nor does the abstract show *how* the enhanced capital structure was dealt with by the partnership.

It must be remembered that all physical properties belonged to the father, and it follows that if particular items were not undervalued when the balance sheet was completed December 31, 1947, then any increase in the inventory could have come from purchases made in subsequent years. These purchases, if paid for, represented new assets, but payment presumptively came from partnership funds in which James had an interest, thereby reducing his proportionate earnings to the extent that profits in hand were converted into physical property— assets owned exclusively by W. C. Hargis, Sr. In the uncertain state of the record touching this point we are not at liberty to substitute a suggested result.

Attention is called to testimony that during James' illness his father paid certain personal bills on the son's account. This was a matter susceptible of either of two constructions: First, the father's intention at the time was no doubt one of indifference regarding repayment, constituting an informal gift; or there could have been

a mental reservation to ask for an accounting. This was not done and we prefer to believe that the father was not concerned with repayment. The net worth of the business after all taxes, interest, penalties, and audit charges had been met was well over $125,000. A profitable going agency emerged from the tax-paying ordeal and there is no suggestion of financial necessity such as might, on purely equitable grounds, prompt a Chancellor to direct restitution.

Our conclusion is that profits earned by James during 1948 could not be primarily charged with individual tax obligations his father owed for 1947 and preceding years when he was sole owner of the business. The defendant's appeal from the Chancellor's finding that any sum was due is dismissed. The decree as it affects the appellant is modified by eliminating the charge made against James' interest for his father's personal taxes, penalties, interest, etc., covering 1947, and by holding that income from all sources placed on the partnership books must be treated as the parties themselves fixed the pattern.

The result is that appellant should have judgment for $27,500.88, with interest and cost. With these directions the cause is remanded for the purpose of ascertaining dates of payments and computing the net amount for which judgment should be rendered.

Mr. Justice McFADDIN thinks the decree should be affirmed.